Slip Op. 14- 51

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| THE TIMKEN COMPANY,<br><br>        Plaintiff,<br><br>      v.<br><br>UNITED STATES,<br><br>        Defendant,<br><br>CHANGSHAN PEER BEARING CO., LTD.<br>and PEER BEARING COMPANY,<br><br>        Defendant-Intervenors. | Before: Jane A. Restani, Judge<br><br>Consol. Court No. 13-00069 |

## OPINION

[Commerce's amended final results in antidumping duty review sustained regarding Commerce's targeted dumping analysis and remanded for Commerce to reexamine alleged currency conversion error.]

Dated: May 2, 2014

William A. Fennell, Terence P. Stewart, and Stephanie M. Bell, Stewart and Stewart, of Washington, DC, for plaintiff.

Tara K. Hogan, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With her on the brief were Stuart F. Delery, Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director. Of counsel on the brief was Justin R. Becker, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Herbert C. Shelley and Christopher G. Falcone, Steptoe & Johnson LLP, of Washington, DC, for defendant-intervenors.

Restani, Judge: This matter is before the court on plaintiff The Timken

Company's ("Timken") and defendant-intervenors Changshan Peer Bearing Co., Ltd. and Peer

Bearing Company's (collectively "CPZ/SKF") motions for judgment on the agency record

pursuant to USCIT Rule 56.2.  The issues before the court stem from the U.S. Department of

Commerce's ("Commerce") amended final determination in the 2010–2011 antidumping duty

review of certain tapered roller bearings from the People's Republic of China.  Tapered Roller

Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China:

Final Results of Antidumping Duty Administrative Review; 2010–2011, 78 Fed. Reg. 3396

(Dep't Commerce Jan. 16, 2013) ("Final Results"), as amended by Tapered Roller Bearings and

Parts Thereof, Finished and Unfinished from the People's Republic of China: Amended Final

Results of Antidumping Duty Administrative Review; 2010–2011, 78 Fed. Reg. 12,035 (Dep't

Commerce Feb. 21, 2013) ("Amended Final Results").  CPZ/SKF challenges Commerce's

failure to correct an alleged ministerial error and convert CPZ/SKF's reported further

manufacturing costs from Thai baht to U.S. dollars.  Changshan Peer Bearing Co., Ltd.'s & Peer

Bearing Co.'s Mem. of Points & Auths. in Supp. of Their Mot. for J. on the Agency R., Ct. No.

13-00095, ECF No. 36, 8–22 ("CPZ/SKF Br. in Supp.").  Timken challenges Commerce's

targeted dumping analysis in the Amended Final Results.  Pl. The Timken Co.'s Mem. of Points

& Auths. in Supp. of Its Mot. for J. on the Agency R., ECF No. 22, 12–25 ("Timken Br.").

Defendant United States ("the government") refutes the challenge to Commerce's targeted

dumping analysis in the Amended Final Results and requests a partial voluntary remand to

Commerce to reexamine CPZ/SKF's further manufacturing costs.  Def.'s Resp. to the Rule 56.2

Mots. for J. on the Agency R., ECF No. 39, 11–21 ("Government Br.").  For the reasons stated

below, Commerce's Amended Final Results are sustained in part and remanded in part.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2012), which grants

the court authority to review actions contesting the final determination in an administrative

review of an antidumping order.  Such determinations are upheld unless they are "unsupported

by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C.

§ 1516a(b)(1)(B)(i).

## DISCUSSION

I.      **Ministerial Error**

        A. Background

              In 1987, Commerce issued an antidumping duty order on tapered roller bearings

and parts thereof from the People's Republic of China.  Antidumping Duty Order; Tapered

Roller Bearings and Parts Thereof, Finished or Unfinished, from the People's Republic of China,

52 Fed. Reg. 22,667 (Dep't Commerce June 15, 1987).  In response to requests from interested

parties, Commerce initiated an administrative review of the aforementioned antidumping duty

order.  Initiation of Antidumping and Countervailing Duty Administrative Reviews, Requests for

Revocations in Part and Deferral of Administrative Reviews, 76 Fed. Reg. 45,227, 45,228–29

(Dep't Commerce July 28, 2011).  The information in dispute before the court was submitted by

CPZ/SKF to Commerce in its questionnaire response on December 12, 2011, which included

information concerning CPZ/SKF's further manufacturing costs incurred in Thailand.  SKF's

Resp. to Dep't's Section C Supplemental Questionnaire, PD 108 at bar code 3045930-01 (Dec.

12, 2011), Ct. No. 13-00095, ECF No. 29 (Aug. 5, 2013).  The file layout prepared by the

programmer that was used to calculate the margin listed the field name for further manufacturing

costs as "Further Manufacturing Cost (USD/PIECE)."  Id.  The supporting documents submitted

by CPZ/SKF that Commerce relied upon in its calculations, however, indicated that the further

manufacturing costs were reported in Thai baht.  See id.

In its preliminary determination, Commerce treated CPZ/SKF's further manufacturing costs as denominated in U.S. currency and calculated a weighted-average dumping margin of 7.74%.  See Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, from the People's Republic of China: Preliminary Results of the 2010–2011 Antidumping Duty Administrative Review, Rescission in Part, and Intent to Rescind in Part, 77 Fed. Reg. 40,579, 40,585 (Dep't Commerce July 10, 2012) ("Preliminary Results").  CPZ/SKF did not raise the issue of the currency inconsistency following the Preliminary Results.  See CPZ/SKF Br. in Supp. 5–6.  Accordingly, Commerce continued to treat CPZ/SKF's further manufacturing costs as denominated in U.S. currency and issued its Final Results on January 16, 2013, calculating a weighted-average dumping margin for CPZ/SKF of 15.28%.  Final Results, 78 Fed. Reg. at 3397.

After Commerce disclosed its calculations for the Final Results, CPZ/SKF timely filed its ministerial error allegation concerning CPZ/SKF's reported further manufacturing costs. SKF's Ministerial Error Comments, PD 194 at bar code 3114908-01 (Jan. 15, 2013), Ct. No. 13-00095, ECF No. 29 (Aug. 5, 2013).  According to CPZ/SKF, the further manufacturing costs should have been treated as denominated in Thai baht, and Commerce thus should have applied the Thai-baht-to-U.S.-dollar exchange rate to those costs.  Id. at 2–6.  On February 21, 2013, Commerce issued its Amended Final Results with a revised weighted-average dumping margin of 14.91%, but Commerce did not recognize the inconsistency concerning CPZ/SKF's further manufacturing costs incurred in Thailand as a ministerial error.  See Amended Final Results, 78 Fed. Reg. at 12,036.  CPZ/SKF challenges Commerce's decision not to address the inconsistency

and its subsequent use in calculations.  CPZ/SKF Br. in Supp. 8–22.

     B. Analysis

        A "ministerial error" is defined as "an error in addition, subtraction, or other

arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like, and

any other similar type of unintentional error which [Commerce] considers ministerial."  19

C.F.R. § 351.224(f) (2013); see also 19 U.S.C. § 1675(h).  CPZ/SKF notes that the error in the

calculation of its reported further manufacturing costs is due to a typo by the programmer who

created the file layout used in Commerce's calculations.  CPZ/SKF Br. in Supp. 4.  CPZ/SKF

asserts that Commerce's  failure to convert the further manufacturing costs to U.S. currency from

Thai baht constitutes a ministerial error, and Commerce's refusal to correct the error is improper

due to interests in accuracy and fairness, even if the error does not constitute a ministerial error.

Id. at 8–22.  The government asserts that the error does not constitute a ministerial error as

defined in the statute and for various reasons there is no binding obligation on Commerce to

correct the error.  Government Br. 19–21.  Notwithstanding Commerce's contention that the

error does not constitute a ministerial error, the government requests partial remand to

Commerce to reconsider the currency discrepancy in CPZ/SKF's reported further manufacturing

costs.  Id.

        Generally, a request for a voluntary remand due to substantial and legitimate

agency concerns should be granted.  SKF USA Inc. v. United States, 254 F.3d 1022, 1029 (Fed.

Cir. 2001).  Commerce's concerns are substantial and legitimate when (1) Commerce has a

compelling justification for the remand, (2) the justification for remand is not outweighed by the

need for finality, and (3) the scope of the remand is appropriate.  Ad Hoc Shrimp Trade Action

Comm. v. United States, 882 F. Supp. 2d 1377, 1381 (CIT 2013).  Here, Commerce has

substantial and legitimate reasons for its request for voluntary remand.  Commerce has a

compelling justification because of a likely inaccurate determination.  See Government Br. 9–10.

Here, the interest in protecting the administrative proceeding from material inaccuracy does not

appear to be outweighed by a need for finality, in part because Timken seeks remand on another

ground, and the other parties to the litigation desire remand to address this alleged inaccuracy.

Lastly, the scope of the remand is appropriate since it is limited to Commerce reconsidering the

currency conversion of CPZ/SKF's reported further manufacturing costs.  Because Commerce

has a substantial and legitimate concern, it is likely that an easily correctable error has occurred,

and there is no suggestion that the request for partial voluntary remand is frivolous or in bad

faith, the government's request for voluntary remand to Commerce to reexamine the conversion

error for CPZ/SKF's reported further manufacturing costs is granted.[1]

## II.     Targeted Dumping

A. Background

Until 2012, Commerce's default methodology for comparing home market and

export prices in administrative reviews of antidumping orders had been the average-to-

transaction ("A-T") methodology.  See Antidumping Proceedings: Calculation of the Weighted-

Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings;

Final Modification, 77 Fed. Reg. 8101, 8101 (Dep't Commerce Feb. 14, 2012).  Commerce,

when using the A-T methodology, did not allow transactions with export prices above the home

---

[1] As Commerce has exercised its discretion to correct this error, if it exists, it is now immaterial whether the error is "ministerial" or not.  Commerce shall correct any error in this regard.

market price to offset transactions with export prices below the home market price.  Id.

Commerce's refusal to offset export prices below the home market price with export prices

above the home market price is referred to as "zeroing."[2]  In February 2012, Commerce changed

its default comparison methodology in administrative reviews to the average-to-average ("A-A")

methodology in order to comply with World Trade Organization decisions and international

obligations.  See id. at 8101–02.  Although Commerce eliminated the practice of zeroing from its

default methodology, Commerce did not rule out the possibility of using zeroing if the

circumstances warranted its use, such as instances of so-called "targeted dumping."  See id. at

8104, 8106–07.

     Commerce uses 19 U.S.C. § 1677f-1(d)(1)(B),[3] which by its terms applies to

antidumping investigations, as the threshold for determining whether to apply the A-T

methodology (likely with zeroing) instead of the default A-A methodology in reviews.  See, e.g.,

Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative

Review: Circular Welded Carbon Steel Pipes and Tubes from Turkey—May 1, 2010, through

---

[2] For a detailed explanation of the zeroing practice and its history, see Union Steel v.
United States, 823 F. Supp. 2d 1346 (CIT 2012), aff'd, 713 F.3d 1101 (Fed. Cir. 2013).

[3] 19 U.S.C. § 1677f-1(d)(1)(B) provides:
The administering authority may determine whether the subject merchandise is being
sold in the United States at less than fair value by comparing the weighted average
of the normal values to the export prices (or constructed export prices) of individual
transactions for comparable merchandise, if—
    (i) there is a pattern of export prices (or constructed export prices) for
    comparable merchandise that differ significantly among purchasers, regions,
    or periods of time, and
    (ii) the administering authority explains why such differences cannot be
    taken into account using [the average-to-average methodology or the
    transaction-to-transaction methodology].

April 30, 2011, A-489-501, at 10 (Nov. 30, 2012), available at

http://enforcement.trade.gov/frn/summary/turkey/2012-29529-1.pdf (last visited Apr. 25, 2014);

Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative

Review of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished from the

People's Republic of China, A-570-601, at 8 (Jan. 8, 2013) ("I&D Memo"), available at

http://enforcement.trade.gov/frn/summary/PRC/2013-00835-1.pdf (last visited Apr. 25, 2014).[4]

Under the targeting statute, before Commerce can use the A-T methodology, Commerce must

first find "a pattern of export prices (or constructed export prices) for comparable merchandise

that differ significantly among purchasers, regions, or periods of time."  19 U.S.C.

§ 1677f-1(d)(1)(B)(i).  This pattern is what is commonly referred to as "targeted dumping."

Additionally, Commerce must explain why the A-A methodology (or the rarely used transaction-

to-transaction ("T-T") methodology)[5] cannot take such differences into account.  Id.

§ 1677f-1(d)(1)(B)(ii).  Commerce thus may use the A-T methodology if it finds targeted

dumping and explains why the default A-A or T-T methodologies cannot take account of the

pattern.

Commerce has used the so-called Nails test to determine whether targeted

---

[4] For further background on the statutory and regulatory framework regarding targeted dumping, see Timken Co. v. United States, Slip Op. 14-24, 2014 Ct. Int'l Trade LEXIS 25, at *2–8 (CIT Feb. 27, 2014).

[5] Although the T-T methodology is also listed as a preferred methodology, Commerce, for practical reasons, rarely employs this methodology.  See 19 C.F.R. § 351.414(c)(2) ("The Secretary will use the transaction-to-transaction method only in unusual situations, such as when there are very few sales of subject merchandise and the merchandise sold in each market is identical or very similar or is custom-made.").

dumping has occurred.[6]  See Certain Steel Nails from the People's Republic of China: Final

Determination of Sales at Less than Fair Value and Partial Affirmative Determination of Critical

Circumstances, 73 Fed. Reg. 33,977 (Dep't Commerce June 16, 2008); Certain Steel Nails from

the United Arab Emirates: Notice of Final Determination of Sales at Not Less than Fair Value,

73 Fed. Reg. 33,985 (Dep't Commerce June 16, 2008).  The Nails test proceeds in two stages,

each done on a product-specific basis (by control number or CONNUM).  The first stage is

referred to as the "standard-deviation" test.  I&D Memo at 10.  If 33% or more of the alleged

targeted group's (i.e., customer, region, or time period) sales of subject merchandise are at prices

more than one standard deviation below the weighted-average price of all sales under review,

those sales pass the standard deviation test and are considered in step two—the "gap" test.  Id.

In performing the gap test, Commerce considers whether the "gap" between the weighted-

average sales price to the targeted group and the weighted-average sales price to the next-highest

non-targeted group is greater than the average gap between the non-targeted groups.  Id. at

10–11.  If the gap between the targeted group and the next-highest non-targeted group is greater

than the average gap, those sales pass the gap test.  Id.  If more than 5% of total sales of the

subject merchandise to the alleged target pass both tests, Commerce determines that targeting

---

[6] It appears Commerce has since adopted an entirely different test in later reviews.  See, e.g., Certain Activated Carbon from the People's Republic of China: Issues and Decision Memorandum for the Final Results of the Fifth Antidumping Duty Administrative Review, A-570-904, at 21–22 (Nov. 20, 2013), available at http://enforcement.trade.gov/frn/summary/prc/2013-28359-1.pdf (last visited Apr. 25, 2014); Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review: Welded Carbon Steel Standard Pipe and Tube Products from Turkey; 2011–2012, A-489-501, at 38–39 (Dec. 23, 2012), available at http://enforcement.trade.gov/frn/summary/turkey/2013-31344-1.pdf (last visited Apr. 25, 2014). The court expresses no opinion on a test that was not employed in this case.

has occurred.  Id. at 11.  Commerce then compares the sales that have passed the Nails test with

total U.S. sales in order to determine if the targeted sales are sufficient to warrant consideration

of the A-T methodology.  Id.

    Turning to the facts of the case before the court, in anticipation of Commerce's

use of the new default methodology (i.e., A-A), Timken alleged that CPZ/SKF engaged in

targeted dumping and submitted factual information to Commerce to use in its targeted dumping

analysis along with a request for Commerce to use the alternative A-T methodology in its

preliminary determination.  Timken's Factual Submission, PD 92–93 at bar code 3044403-01

(Dec. 2, 2011), ECF No. 29 (Aug. 12, 2013); Timken's Pre-Preliminary Comments, PD 160 at

bar code 3075802-01 (May 16, 2012), ECF No. 29 (Aug. 12, 2013).  Commerce used the default

A-A methodology and did not engage in a targeted dumping analysis in the preliminary results.

Preliminary Results, 77 Fed. Reg. at 40,582.  Commerce explained that it applied the newly

adopted default methodology in order to afford the parties an opportunity to comment on its

application in the context of this review and stated that it intended to consider whether an

alternative methodology was appropriate under the circumstances of this review.  Id.

    In its post-preliminary analysis, Commerce found that an insufficient number of

sales passed the Nails test to warrant using the A-T methodology.  Post-Preliminary Calculation

Memorandum at 2, PD 183 at bar code 3109493-01 (Dec. 7, 2012), ECF No. 29 (Aug. 12, 2013).

After the parties submitted their comments, Commerce continued to find that an insufficient

number of sales passed the Nails test and thus refused to depart from the default A-A

methodology.  I&D Memo at 10–14.  In its justification, Commerce noted that the use of the

word "may" in 19 U.S.C. § 1677f-1(d)(1)(B) gave Commerce the discretion not to depart from

the default A-A methodology even if both prongs of the <u>Nails</u> test were satisfied.  <u>Id.</u> at 12.

Timken challenges Commerce's determination regarding Timken's targeted

dumping allegation, arguing that Commerce deviated from its past practice in its application of

the <u>Nails</u> test and that Commerce provided no explanation regarding its application of its

sufficiency determination.[7]  <u>See</u> Timken Br. 12–25.  The government maintains that Commerce's

determination was consistent with its prior applications of the <u>Nails</u> test and that Commerce

makes its determinations regarding whether to use the A-T methodology on a case-by-case basis

rather than employing a specific de minimis threshold.  <u>See</u> Government Br. 11–18.  CPZ/SKF

argues that Commerce has not departed from its past practice and has provided a sufficient

explanation for its final determination.[8]  <u>See</u> Resp. Br. of Changshan Peer Bearing Co., Ltd. &

Peer Bearing Co. Opp. the Rule 56.2 Mot. of The Timken Co., ECF No. 36, 11–28 ("CPZ/SKF

Br. in Opp'n").

B. Analysis

*1. Consistency with Past Practice*

Timken first argues that Commerce's decision to compare the results of the <u>Nails</u>

---

[7] Timken refers to Commerce's sufficiency determination as a de minimis test.  <u>See</u> Timken Br. 23–24.  The government denies that Commerce created a de minimis test.  <u>See</u> Government Br. 15–18.  Because of this disagreement in labeling the step in Commerce's analysis as a de minimis test, the court will refer to Commerce's determination as a sufficiency determination.

[8] CPZ/SKF maintains its position that Commerce lacks the statutory authority to engage in a targeted dumping analysis in an administrative review, but does not appeal Commerce's decision to engage in such an analysis in this case because it concurs with Commerce's final determination.  Resp. Br. of Changshan Peer Bearing Co., Ltd. & Peer Bearing Co. Opp. the Rule 56.2 Mot. of The Timken Co., ECF No. 36, 12 n.5.  The court rejected this same argument in <u>Timken Co. v. United States</u>, 2014 Ct. Int'l Trade LEXIS 25, at *18 n.7, and <u>CP Kelco Oy v. United States</u>, Slip Op. 14-42, at 8–13 (CIT Apr. 15, 2014).

test to total U.S. sales when determining whether a sufficient pattern exists as part of the targeted

dumping analysis is inconsistent with Commerce's past practice in applying the <u>Nails</u> test.  <u>See</u>

Timken Br. 12–18.  According to Timken, Commerce's prior decisions have established a

practice of considering any sales that have passed the <u>Nails</u> test as constituting a pattern, thereby

warranting a comparison between the resulting margins under the A-A methodology and the A-T

methodology.  <u>Id.</u> at 14–18.  Timken alleges that Commerce explicitly had declined in four other

cases to engage in a de minimis inquiry in determining whether a pattern exists for purposes of

19 U.S.C. § 1677f-1(d)(1)(B).   <u>Id.</u> (citing Issues and Decision Memorandum for the Final

Determination in the Antidumping Duty Investigation of Multilayered Wood Flooring from the

People's Republic of China, A-570-970 (Oct. 11, 2011), <u>available at</u>

http://enforcement.trade.gov/frn/summary/prc/2011-26932-1.pdf (last visited Apr. 25, 2014);

Issues and Decision Memorandum for the Less than Fair Value Investigation of Certain Steel

Nails from the United Arab Emirates, A-520-804 (Mar. 19, 2012),

<u>available at</u> http://enforcement.trade.gov/frn/summary/uae/2012-7067-1.pdf (last visited Apr. 25,

2014); High Pressure Steel Cylinders from the People's Republic of China: Issues and Decision

Memorandum for the Final Determination, A-570-977 (Apr. 30, 2012), <u>available at</u>

http://enforcement.trade.gov/frn/summary/prc/2012-10952-1.pdf (last visited Apr. 25, 2014);

Issues and Decision Memorandum for the Antidumping Duty Investigation of Large Residential

Washers from the Republic of Korea, A-580-868 (Dec. 18, 2012), <u>available at</u>

http://enforcement.trade.gov/frn/summary/korea-south/2012-31104-1.pdf (last visited Apr. 25,

2014)).  Timken argues that remand is necessary due to Commerce's divergence from past

practice and its failure to provide a justification for its change in practice.  <u>Id.</u> at 18–22.

        The government argues that Commerce's determination was consistent with its

prior decisions and a reasonable exercise of its discretion.  Government Br. 12–18.  Commerce

cited three prior cases in which it engaged in a similar sufficiency analysis, notwithstanding the

fact that some sales had passed the Nails test.  I&D Memo at 11–12 (citing Certain Stilbenic

Optical Brightening Agents from Taiwan: Preliminary Determination of Sales at Less than Fair

Value and Postponement of Final Determination, 76 Fed. Reg. 68,154 (Dep't Commerce Nov. 3,

2011); Ball Bearings and Parts Thereof from France, Germany, and Italy: Final Results of

Antidumping Duty Administrative Reviews; 2010–2011, 77 Fed. Reg. 73,415 (Dep't Commerce

Dec. 10, 2012); Circular Welded Carbon Steel Pipes and Tubes from Turkey; Final Results of

Antidumping Duty Administrative Review; 2010 to 2011, 77 Fed. Reg. 72,818 (Dep't

Commerce Dec. 6, 2012)).  The government also argues that Commerce's determination was a

reasonable exercise of its discretion and otherwise in accordance with law.  Government Br.

17–18.  Although Commerce stated that a sufficient pattern under the Nails test did not exist in

this case, Commerce further supported its decision to use the A-A methodology by relying on its

discretionary authority granted by the statute.  Commerce noted that 19 U.S.C.

§ 1677f-1(d)(1)(B) states that Commerce "may" use the A-T methodology if it finds targeted

dumping, but it is not required to do so.  I&D Memo at 12.  Commerce also noted it had

previously indicated that it would proceed on a case-by-case basis in determining when to use

the A-T methodology and explained that its prior cases did not preclude the analysis undertaken

here.  Id.

        CPZ/SKF argues that Commerce had no duty to explain any departure from its

past practice because the cases cited by Timken do not reflect a well-established practice from

which Commerce would be obligated to explain a departure.  CPZ/SKF Br. in Opp'n 11–16.

CPZ/SKF argues further that Commerce's targeted dumping methodology does not warrant a

presumption of continuity because its methodology has been in a state of flux in recent years and

Commerce had indicated an intention to proceed on a case-by-case basis.  Id. at 16–17.

      Timken's argument regarding past practice is essentially the same argument that

was presented in Timken Co. v. United States, Slip Op. 14-24, 2014 Ct. Int'l Trade LEXIS 25

(CIT Feb. 27, 2014).  In that case, the court treated Commerce's sufficiency determination as an

exercise of its discretionary authority granted by 19 U.S.C. § 1677f-1(d)(1)(B) and found that the

cases cited by Timken, which are also cited by Timken in this case, did not create any

meaningful inconsistencies.  See id. at *23–28.  As indicated, here, Commerce invoked its

discretionary authority granted by 19 U.S.C. § 1677f-1(d)(1)(B) in its decision to not use the A-T

methodology.  I&D Memo at 12.  As the court held in Timken Co., there is little, if any,

inconsistency with the cases cited by Timken when Commerce's sufficiency determination is

understood as an exercise of its discretionary authority.  Timken Co., 2014 Ct. Int'l Trade

LEXIS 25, at *23.  Because Timken's arguments on this issue mirror the arguments that were

rejected in Timken Co., the court, for the reasons stated in Timken Co., continues to find that

Commerce's prior practice does not preclude it from engaging in a sufficiency determination as

part of its exercise of discretionary authority.  See id. at *13–29.

### 2. Commerce's Explanation of Its Sufficiency Determination

      Timken also argues that Commerce failed to explain the purpose of its additional

sufficiency determination and what amount of sales it considers sufficient.  Timken Br. 23–25.

Because Commerce allegedly failed to provide such an explanation, Timken argues that remand

is necessary.  Id.[9]

      In response to Timken's arguments regarding the purpose of the sufficiency

determination, the government explains that it is within Commerce's discretion to continue to

employ the A-A methodology, even if targeted dumping is found, and that Commerce uses the

additional sufficiency determination in exercising that discretion.  Government Br. 13–18.  The

government explains further that Commerce is proceeding on a case-by-case basis rather than

establishing a de minimis threshold, and Commerce uses the additional sufficiency determination

in its case-by-case analysis in deciding when to exercise its discretion.  Id. at 15–17.  The

government additionally argues that Commerce's experience in conducting the Nails test has

informed its judgment in determining whether the A-T methodology is appropriate.  Id. at 18.

      Again, the same issue and arguments were presented to the court in Timken Co.

As explained in Timken Co., the purpose of the sufficiency test is clear.  Commerce relies on the

word "may" in the statute, and, as a result, the additional sufficiency determination used by

Commerce is easily understood as a tool in determining whether Commerce should exercise its

discretion to depart from the default A-A methodology.  Timken Co., 2014 Ct. Int'l Trade

LEXIS 25, at *31–32.  Only when a significant number of sales pass the Nails test, when

compared to total U.S. sales, will Commerce consider invoking its discretion to depart from the

default A-A methodology.  Id.; I&D Memo at 11.

---

    [9] The court notes that Timken also suggests that comparing the number of sales that pass
the Nails test to all U.S. sales is unreasonable because the Nails test fails to capture all targeted
sales.  Timken Co.'s Reply Br., ECF No. 42, 18–20.  To the extent that Timken may be relying
on this argument to attack directly Commerce's determination, Timken failed to raise this
argument in its opening brief and did not present it to the agency.  The court therefore will not
consider it.  See KYD, Inc. v. United States, 836 F. Supp. 2d 1410, 1413–14 (CIT 2012).

      To support its argument that remand is necessary because Commerce was required—but failed to—explain what amount of sales would be considered "sufficient," Timken cites Washington Red Raspberry Commission v. United States, which held in the then absence of a statute or regulation defining de minimis that Commerce "may find that dumping margins less than 0.50 percent are de minimis, but only if [Commerce] explains the basis for its decision." Wash. Red Raspberry Comm'n v. United States, 859 F.2d 898, 903 (Fed. Cir. 1988). The government argues that Commerce satisfied its obligation to explain by (1) conducting the Nails test, (2) evaluating the volume of sales passing the Nails test relative to all U.S. sales, and (3) determining whether the facts justified employing the A-A methodology. Government Br. 18 (citing I&D Memo at 11).

      Commerce generally has a duty to explain the grounds for its determination. NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009); see also 19 U.S.C. § 1677f(i)(3)(A) (requiring Commerce to include an explanation of the basis for its determination). If an agency's explanation is not perfectly presented, a court may find that the agency adequately explained its determination if the agency's line of reasoning is "reasonably discernable." NMB Singapore Ltd., 557 F.3d at 1319. When proceeding on a case-by-case basis in exercising discretionary authority, as Commerce does here, "Commerce is not required to justify its determination in terms of past alternatives," as long as it acts reasonably. Qingdao Taifa Grp. Co. v. United States, 780 F. Supp. 2d 1342, 1350 (CIT 2011).

      Here, Commerce has explained adequately its analysis in reaching its determination that the sales found to have passed the Nails test were insufficient to warrant consideration of the alternative A-T methodology. The default methodology in reviews is the

A-A methodology.  19 C.F.R. § 351.414(c)(1).  The statutory provision that Commerce uses as

guidance in reviews in deciding whether to deviate from the default methodology states that

Commerce "may" use the A-T methodology in the context of a targeted dumping analysis if

certain conditions are met.  19 U.S.C. § 1677f-1(d)(1)(B).  Even when those conditions are

satisfied, however, Commerce is not required to abandon the A-A methodology.  Id.  Unlike the

situation in Washington Red Raspberry Commission, upon which Timken heavily relies, the

relevant statutory provision in this case expressly gives Commerce the discretion to ignore a

targeted dumping finding and continue to employ the A-A methodology.  The court gives

substantial deference to Commerce in choosing whether to invoke such discretion.  Cf. AK Steel

Corp. v. United States, 28 CIT 1408, 1417, 346 F. Supp. 2d 1348, 1355 (2004) (declining to

require Commerce to prove that respondent cooperated to the best of its abilities when it refuses

to use adverse facts available because statute expressly stated that Commerce "may" use adverse

facts when respondent fails to cooperate to best of its abilities, not that it must).  Commerce

found that the results of the Nails test were insufficient to warrant consideration of the A-T

methodology because the percentage of sales found to be targeted was extremely small.[10]  In its

briefs submitted to the court, Timken argues that the A-T methodology is warranted if any sales

pass the Nails, but Timken fails to put forth any detailed and specific argument as to why the

amount of sales in this case should otherwise be considered sufficient.  Although Commerce did

not set an amount of sales it considers sufficient, no reasonable person could find the minuscule

percentage of sales found to be targeted in this case to be sufficient to require Commerce to

---

[10] For the exact percentages, see Response Brief of Changshan Peer Bearing Co., Ltd. and Peer Bearing Co. Opposing the Rule 56.2 Motion of The Timken Co., ECF No. 35, 25 (confidential version).

invoke its discretion to abandon the default A-A methodology in favor of the A-T

methodology.[11]   Commerce explained its analytical steps and considered and rejected Timken's

arguments before the agency regarding why the amount of targeted sales should be considered

sufficient in this case.  I&D Memo at 10–13.  Under the facts of this case, this was an adequate

explanation.[12]

          The court does not hold that Commerce is excused from providing an explanation

for its sufficiency determinations.  The court holds rather that because Commerce relied on the

default A-A methodology, the percentage of sales that were targeted was very small, and Timken

has failed to present a detailed argument to the court why the small number of targeted sales in

---

[11] This does not mean that Commerce necessarily was precluded from invoking such
discretion.

[12] The court recognizes that the court remanded another recent targeted dumping case for
Commerce to further explain the application of its de minimis test.  See CP Kelco Oy, Slip Op.
14-42.  In CP Kelco, Commerce summarily rejected the respondent's claim that the amount of
sales that passed the Nails test should be considered de minimis.  Id. at 19.  The court remanded
to Commerce for a reasoned explanation for rejecting the respondent's de minimis claim.  Id. at
20–21.
     The case currently before the court is distinguishable in two important and related
respects.  First, Commerce in this case refused to depart from the default A-A methodology.  In
contrast to CP Kelco, where Commerce "used an exceptional methodology to generate Kelco's
margins," here, Commerce chose not to deviate from the default methodology to increase
margins.  See id. at 21 n.14.  Second, the court in CP Kelco did not decide whether the targeted
sales were de minimis, although the percentage there was much greater.  See id.  The court here,
in contrast, finds that the amount of sales passing the Nails test are so small that no reasonable
person could conclude that Commerce would be required to invoke its discretion to apply the
"exceptional" A-T methodology and increase margins.  In fact, Timken never explained in its
briefs to the court why the amount of targeted sales in this case should be considered sufficient,
aside from arguing that any sales that pass the Nails test should be considered sufficient as part
of its attack on Commerce's general ability to engage in an additional sufficiency inquiry.  To
the extent that Timken raised any such arguments before the agency, they appear to have been
addressed by Commerce in the I&D Memo, and Timken has not challenged directly those
explanations.  See I&D Memo at 13.

this case should be considered sufficient to require use of the A-T methodology, Commerce's

explanation was adequate for the court to determine that it acted reasonably.

## CONCLUSION

For the foregoing reasons, the government's request for voluntary remand is

granted for Commerce to reexamine the alleged currency conversion error for CPZ/SKF's

reported further manufacturing costs.  In all other respects, the <u>Amended Final Results</u> are

sustained.  Commerce shall complete and file its remand determination by June 2, 2014.  Timken

and CPZ/SKF shall have until July 2, 2014 to file objections, and the government shall have until

July 18, 2014 to file its response.


 /s/ Jane A. Restani 
Jane A. Restani
Judge

Dated: May 2, 2014
       New York, New York